The opinion of the court was delivered by
Breaux, J.
This is a suit brought by plaintiff to recover of the defendant the sum of fifty thousand dollars for the loss of her son, George McFee, who Avas killed while in the service of the defendant. *792 company as fireman on one of its engines, on the 9th of September, 1889, in a wreck of the railroad of the company.
The amount is alleged as due as follows: for damages in the physical and mental torture endured by him from the burns and wounds which caused his death, and the apprehension of certain death which awaited him, the sum of §15,000; for damages suffered in the loss of the society and support of her son the sum of §15,000, and she, in addition, alleges that she has suffered exemplary damages in the sum of §20,000, resulting from the wilful and criminal negligence of the defendant company in running its trains over an unsafe and dangerous track, the necessary repairs to which were delayed, although the dangerous condition and consequent peril to the safety and lives of its employés and the public were well known to the managers of the company.
It is also alleged that the disaster which resulted in the death of plaintiff’s only son was caused by deficient and insecure rails and rotten cross ties, which were totally unfit for the service required and the uses to which they were put. That the rails were greatly worn by age and use, and of a type and material long since out of use.
That the cross ties were worthless and unfit to bear the heavy weight of the ponderous engines and cars.
That the condition of the track, rails and ties was well known to the defendant, which is guilty of gross and criminal negligence in failing to repair and put same in safe condition for traffic and travel.
That a parsimonious policy was pursued; as a result the repair force was reduced to a number totally insufficient. ¡¡’ * -Y * * * * *
The defendant company, on its part, denies any fault or negligence, alleges that the employés were competent, skilled and were supplied with necessary material to keep the track in good order, and if there was any defect it was latent.
That if there was any responsibility it rested with the co-employés of the deceased.
If there was any defect the deceased was aware of the condition of the track, having passed daily over it for months.
The jury found a verdict for the plaintiff for actual damages to the amount of §7500, and for punitive damages in the amount of §5000.
The testimony is quite conflicting.
*793 There are not many undisputed facts in the case. It is not contested that the deceased was the only son of the plaintiff, and that he was 22 years of age; that he had been an employé of the defendant as a fireman about one year.
These are about the only facts in regard to which there is no disagreement. A number of witnesses were examined on the part of plaintiff.
Some of these witnesses were present when the accident occurred; others testify as to the condition of the road, examined at other times.
Several of the witnesses testify that deceased lived six or seven hours after his injuries, conscious most of the time, and suffering excruciating pain and intense agonies.
He died from the effect of the injuries received in the wreck at the time alleged. He was scalded to death.
With reference to the cause of the accident, the witnesses for the plaintiff do not disagree in anything material.
They testify that the ties were not sound. The iron rails were not securely fastened to the ties. There were low joints connecting rails; high centers and no ballast. The ties were so broken and decayed that it was possible to break them with one’s hand.
It is stated further that the average life of a steel rail is about ten years, and of art oak tie in alluvial sections of country four or five years on a road on which there is ordinary wear by passenger and freight trains. That the rails and ties have not been renewed since great many years. The road was not in perfect alignment in the mile sixteen, in which the accident occurred. It was not safe to run a train over mile sixteen at the rate of fifteen miles an hour. That the old style iron rails used have been done away with long since. That the modern and safer appliances to secure the rails in position had not been procured. That the cars ran entirely out of line immediately in front and immediately in the rear of the place where the accident happened.
We do not think it necessary to further summarize the testimony •of plaintiff’s witnesses on this line. Suffice it to say that they agree in stating that the railroad was not at all in good condition. í¡í * * 5¡« * if* *
The witnesses for the defendant (employés of the company) do not entirely agree in their statements as to the condition of the road and *794 as to the immediate cause of the accident. They state that the company furnished necessary materials to repair and maintain the road. That it was generally in a fair condition, safe for all trains. That the cross ties were not so decayed as to make traveling on the road unsafe.
Some of the witnesses testify that there was a cross tie decayed— a mere shell — at the place of the derailment. A few of the witnesses testify that none of the ties were in such condition as to make it necessary to take them out, except at the place of the wreck.
With reference to the direct or immediate cause of the accident there does not seem to be absolute certainty, or, at any rate, agreement in statement of a sufficient number of witnesses to make the cause evident — that is, as to whether it was owing to a defective joint fastening or cross tie or rail. Some of plaintiff’s witnesses, who testify on the subject, state that the derailment was caused by decayed ties giving way under the rails, throwing the engine off the track.
The supervisor of the road, testifying as a witness for the defendant, states that there was a decayed tie under the joint where the rails are connected and fastened; the rail had slipped a little. The flange of the wheel mounted the end of a rail and ran about twenty-four feet on its top before leaving it.
He testifies further:
Q. “ What was the condition of the tie upon which that chair was placed?
A. “ The inside of the tie was rotten. The outside appeared to be sound, but was cracked right under the rail. I kicked it off where the engine mounted. It was perfectly rotten. The shell was thin, in some places a half inch, and in some places thicker, and appeared to be sound. To the eye it appeared to be sound until I kicked it off..
Q,. “What was the cause of the bad connection there?
A. “It was caused by the spikes not holding. That shell was loose' and would not hold the spikes. The spikes going into the rotten tie would not hold.”
Other witnesses have testified to the same effect. X * * * * * * *
The record discloses that the road was being repaired at the time of the accident. That the old was being replaced by new rails.
*795 The train starter testifies that during the year ending October 1, 1889, more than 1501 trains ran over mile sixteen.
In answer to a motion to produce it, the defendant company brought into court the “ Oonductor’s Accident Report.” From it we extract the following:
“ Personal Injury. — Name, George McFee; age, 25 years; occupation, fireman; residence, Monroe.
Q. “ Married or single?
A. “ Single.
Q. “ Had he children?
A. “None.
Q. “ Extent of injuries?
A. “ Badly scalded, causing death.
Q. “ Was injury caused by carelessness of the individual? If so, in what respect?
A. “No.
Q. ‘ ‘ Was injury caused by carelessness of any employé of the-company? Was injury caused by any defect in roadway, track, bridges, machinery, rolling stock or equipment of any kind? If so, describe nature of said defect fully.
A. “ Bad track, rotten cross ties and chair off rail.” [A chair is the fastening on either side of each end of the rail.]
An analysis of the testimony has resulted in convincing us that the answer in the “ Oonductor’s Accident Report ” is correct. He was in a position to know. His record was made at the time. It is corroborated as to its correctness by a decided preponderance of the testimony.
It devolves on railroad companies to maintain a safe road bed, undecayed cross ties, and to see that the rails are properly adjusted and in proper position.
The evidence further discloses that George McFee, the deceased, contributed something to the support of his family at different times. His mother,.the plaintiff, is a widow, and has two daughters. The-youngest is about 16 years of age. At times, when in Monroe, the deceased resided at his mother’s home. She has property of no great value, and is in debt. She owns her dwelling house, and collects small rents.
*796 This case, in so far as relates to the condition of defendant’s railroad, and the accident which caused the damages, is similar in many respects to the case of Rutherford vs. Shreveport & H. R. Co., 41 An. 793.
In that case it was held that there was negligence on the part of the defendant company, and damages were allowed for the injuries received, the sufferings and the loss.
The duty now devolves upon us of fixing the amount of damage. It is a responsibility we meet with concern and not without solicitude.
If we were to consider only the excruciating pain, the agony suffered from the time of the injury until the death, the mental distress of the deceased while struggling with death, the great suffering of the mother in parting from her only son, the affliction the sad event memory unwillingly and mournfully recalls, and attribute these to wilful and outrageous negligence, the amount of our decree would be a very large amount.
While there must be compensatory damages allowed, it must not be forgotten that defendant’s employés, although negligent, never for an instant realized the possibility of an accident to one against whom they did not bear the least ill will.
There was too much delay in making repairs, an excess of economy, error of judgment; but these are no acts of malicious or outrageous negligence.
From the case of Peyton vs. Texas & P. R. Co., 41, we quote: “A review of our reports in similar cases points to only two occasions on which this court has allowed damages in excess of $10,000 for personal injuries. Among the cases we find an allowance of $7000 for ■an accident whereby the head of a large family lost his life — their •only support; and the allowance of $5000 in another, and $3000 in •another case. We find that the courts of other States have allowed less.”
In the case of Poirier vs. Carroll, 35 An. 708, the court held: “The verdict of the jury was for $12,000. We think it is excessive, and should be reduced. The suit is not nor could it be brought for damages sustained in consequence of the death of Poirier, but for the suffering and pain which he endured from the time of the explosion to that of his death — a period of some-eighteen hours; during part of which he was apparently insensible or unconscious. Whatever *797 the endurance was, his widow and minors can not secure heavier damages than he would have been entitled to demand and receive had he survived.”
“ In the case of Vredenburg, in which the unfortunate victim had been sprung upon by a ferocious bear which lacerated his flesh, and he suffered tortures ending after twenty-eight days, the jury had allowed §15,000. Their verdict was reduced to $7500. We do not think that under the circumstances of the ease, the suffering not having been longer than twenty-four hours, the plaintiff should recover more than §2500.” * :M :¡: * * * *
Having considered the jurisprudence on the subject fixing the amount in similar cases at considerably less than we allow in our decree, and giving due weight to the verdict of the jury, to which we attach importance, although we can not agree with its finding, we fix the compensatory damages at §6000.
The object is not benefit. We think this amount secures justice. We will not particularize the damages, and we will not dissect the purest sentiments and the kindest impulses to establish how much is allowed for each separate item of suffering.
The facts have been carefully examined; our conclusions have been reached, and the amount fixed after close study, deliberation and consultation.
The reasoning which led to the conclusion just expressed precludes the possibility of condemning the defendant to pay exemplary damages. If such damages are allowable as such, at all, under our system, they are allowable only when an element of malice or evil intent or oppression enters into and forms part "of the act.
This, the line of reasoning followed by us has already negatived.
It is therefore ordered, adjudged and decreed that the verdict and judgment appealed from be amended by deducting therefrom the sum of §5000 allowed for punitive or exemplary damages; that the amount allowed for actual or compensatory damages be reduced from §7500 to $6000, and that as thus amended the judgment is affirmed with interest at legal rates from judicial demand, in the amount allowed, defendant and appellant to pay the costs of the lower court, plaintiff and appellee the costs of appeal.
*798 McEnery, J.
f concur in'the principles announced in the decree in this case, but .reluctantly differ in opinion from the majority of the court in the estimation of actual or compensatory damages.
I am of the opinion that in this respect the judgment appealed from should be affirmed. Carly vs. Railroad, 40 An. 810.